UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ENDURANCE CAPITAL, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:21-cv-03015-JMS-MKK |
| | ) | |
| SENECA INSURANCE COMPANY, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

**<u>ORDER</u>**

Plaintiff Endurance Capital, LLC ("<u>Endurance</u>") was assigned the rights and interests to a property insurance policy ("<u>the Policy</u>") that was issued by Defendant Seneca Insurance Company, Inc. ("<u>Seneca</u>").  During the time period of the Policy, trespassers caused extensive damage to the insured property and stole items.  Endurance, through its predecessors in interest, filed a claim for coverage under the Policy, and Seneca refused payment.  Endurance subsequently brought this lawsuit against Seneca seeking declaratory judgment of Seneca's obligation to pay for the loss under the Policy and asserting claims for breach of contract and breach of the duty of good faith. [Filing No. 1.]  Endurance has filed a Motion for Partial Summary Judgment, [Filing No. 99], and Seneca has filed a Cross-Motion for Summary Judgment, [Filing No. 112], a Motion to Exclude, [Filing No. 115], and a Motion for Oral Argument on both motions, [Filing No. 130].  In response, Endurance has moved to strike Seneca's Motion to Exclude.  [Filing No. 123 at 3-5.]  All of these Motions are ripe for the Court's review.

## I.
### SENECA'S MOTION FOR ORAL ARGUMENT

Seneca filed a Motion for Oral Argument on the Parties' Motions for Summary Judgment and Seneca's Motion to Exclude Report and Testimony of Plaintiff's Expert Witness Brian Haden. [Filing No. 130.]  The parties' briefs afforded the Court an adequate basis on which to rule on the pending motions without the assistance of oral argument.  The Court, therefore, **DENIES** Seneca's Motion for Oral Argument, [Filing No. 130].

## II.
### ENDURANCE'S MOTION TO STRIKE

Endurance moved to strike Seneca's Motion to Exclude for lack of compliance with the Local Rules, the Case Management Order, and the Court's Practices and Procedures as they pertain to collateral motions.  [*See* Filing No. 123 at 3-5; Filing No. 124 at 1; Filing No. 129 at 2-3.] Endurance also moved to strike for lack of compliance with the page limits set forth in the Court's Practices and Procedures.  [Filing No. 123 at 4-5; Filing No. 129 at 2-3.]  Endurance argues that Seneca's separately filed Motion to Exclude should be stricken because Local Rule 56-1(i) provides that "[t]he court disfavors collateral motions—such as motions to strike—in the summary judgment process [and that] [a]ny dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief."  [Filing No. 123 at 4; Filing No. 124 at 1.] Endurance also argues that the motion should be stricken for failure to comply with the Amended Case Management Order, which also orders objections to expert witness testimony to be made in a responsive brief.  [Filing No. 123 at 4; Filing No. 124 at 1; *see* Filing No. 71 at 1.]  Lastly, Endurance points to the Court's Practices and Procedures which remind counsel that collateral motions are disfavored.  [Filing No. 123 at 4; Filing No. 124 at 1.]

Seneca argues that it "was given express permission" by the Magistrate Judge to file the Motion to Exclude as a separate motion and points to an email supporting that argument. [Filing No. 128 at 2; Filing No. 127-1.] After the parties' status conference with the Magistrate Judge on June 15, 2023, the Magistrate Judge emailed the parties stating, "You do not need to embed or incorporate your *Daubert* argument into your summary judgment response. You may file the *Daubert* challenge as a separate motion." [Filing No. 127-1.] Because the Magistrate Judge permitted the filing of a separate motion, the Court **DENIES** Endurance's motion to strike, [Filing No. 123], on this ground.

As to Endurance's argument that Seneca failed to comply with the page limits set forth in the Court's Practices and Procedures, this quarrel appears to derive from the parties consulting different versions of the Court's Practices and Procedures. The Court's current Practices and Procedures provides a 50-page limit for a response and cross-motion for summary judgment. *See* Practices & Procedures, Judge Jane E. Magnus-Stinson, *available at* https://www.insd.uscourts.gov/sites/insd/files/JMS%20PRACTICES%20AND%20PROCEDURES.pdf. Yet an older version of the Court's Practices and Procedures, in effect in 2022 shortly after this case was filed, is docketed in this case, and provides a page limit of 55 pages for a response and cross-motion for summary judgment. [Filing No. 37 at 3.]

Seneca is entitled to rely on the docketed version of the Court's Practices and Procedures, and the Court **DENIES** Endurance's motion to strike, [Filing No. 123], on this ground as well. However, the **CLERK IS DIRECTED** to docket the current version of the Court's Practices and Procedures, which shall govern from here on out. The Court cautions Seneca that the current version of the Court's Practices and Procedures prohibits citations in footnotes and that they are expected to adhere to this prohibition in future filings.

### III.
### SENECA'S MOTION TO EXCLUDE

**A.  Standard of Review**

Federal Rule of Evidence 702 provides that expert testimony is admissible if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  A trial judge "must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).  This determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.  "Many factors . . . bear on the inquiry," *id.* at 593, and the focus "must be solely on principles and methodology, not on the conclusions that they generate," *id.* at 595.

Rule 702 imposes a "gatekeeping obligation"; the Court "must engage in a three-step analysis before admitting expert testimony.  It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).  The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the

reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

## B.  The Parties' Arguments

In connection with its Motion for Partial Summary Judgment, Endurance relies upon the opinions of Brian Haden from Haden Claims Services, who Endurance engaged to inspect the insured property at issue in this case—a building located in Muncie, Indiana (the "Property")—and to determine the amount of loss.

Seneca argues that the Court should reject Mr. Haden's testimony and his Report (the "Haden Report") for the purposes of both summary judgment and trial based on Federal Rule of Evidence 702 and *Daubert*. Specifically, Seneca argues that Mr. Haden is unqualified to be considered an expert witness because:

- "he has never taken any specific classes related to building materials, electrical engineering, or electrical contracting";

- "he has no apprenticeship or internship experiences regarding electrical contracting";

- "he has never worked in the construction field, has never installed or replaced any commercial roofing systems, nor has he ever repaired or replaced any electric wiring in a commercial building";

- "he has never handled any claims in the State of Indiana while employed by State Farm or Liberty Mutual";

- "he has never been recognized or testified in an expert capacity in an Indiana state or federal court";

- "he is not licensed do to business in the State of Indiana and . . . is not being offered as a public adjuster in this litigation"; and

- he does not "explain how his experience 'leads to the conclusion reached, why that experience is a sufficient bases for the opinion, and how that experience is reliably applied to the facts.'"

[Filing No. 116 at 10-11 (quoting Fed. R. Evid. 702 advisory comm. note (2000 Amendments)).] Seneca also argues that the Haden Report is not reliable because Mr. Haden "admitted in his deposition testimony that he was operating on limited information when he investigated the Property and preparing the Haden Report," including not knowing that thieves returned to the Property and not knowing that that the power was off in the building at the time of the loss. [Filing No. 116 at 12.] Seneca asserts that these "fundamental factual errors" render Mr. Haden's conclusions unreliable and no longer valid. [Filing No. 116 at 12.] Seneca also argues that its experts show that Mr. Haden and the Haden Report are unreliable. [Filing No. 116 at 13-18.] In support, Seneca asserts that the Haden Report is not as thorough as the report prepared by Seneca's expert, Brian Tognetti, because Mr. Haden did not remove ceiling tiles to examine water-related damage, and Mr. Haden is unreliable because what he identified as sheetrock from a figure in Mr. Tognetti's report, was "absolutely not" sheetrock according to Mr. Tognetti. [Filing No. 116 at 14-15.] Seneca also asserts that Mr. Haden's inspection was "haphazard" because he included photographs from other locations on the roof and claimed that the concrete deck was flat with zero slope, yet Mr. Tognetti claimed that the photographs were irrelevant and that the concrete deck is in fact sloped. [Filing No. 116 at 15.] Seneca further asserts that Mr. Haden's conclusion that the separation of wallpaper from the seam was caused by the theft event is contradicted by both Mr. Tognetti and Seneca's other expert, Michael Newman, who agree that, although the condition existed immediately after the theft, it is not something that typically occurs as a result of someone removing wiring from a building. [Filing No. 116 at 17.] Lastly, Seneca argues that the Haden Report is not relevant and is not helpful to the trier of fact because Mr. Haden relies on electrical damages estimates from Holt Construction Group ("Holt Construction") and Rebuilt Construction,

LLC ("Rebuilt Construction") and does not address any of the key issues in the case, which Seneca lists as:

- "whether the damages to the Property should be categorized as theft or vandalism";

- "determining the rehabilitative cost for damages to the Property";

- "to what extent water intrusion caused damages to the Property and whether those water related damages were caused by the November 2019 theft incidents"; and

- "whether Seneca acted in bad faith in conducting its claim investigation."

[Filing No. 116, at 18-20.]

Endurance responds that Mr. Haden is qualified to offer an opinion as to the value of the damages caused by the trespassers and points to Mr. Haden's involvement in insurance adjusting since 1998. [Filing No. 124 at 2.] Endurance argues that Mr. Haden's 25-year career in nationwide insurance adjusting and his certification from the International Association of Umpires make him "fully qualified to estimate damage, and to decide between competing estimates," despite not having handled claims in Indiana before. [Filing No. 124 at 4.] Endurance also argues that, in light of the new information that the power was off at the time of the break-ins, Mr. Haden revised his opinion to account for that fact and concluded that several items in the estimate were not necessary. [Filing No. 124 at 3.] However, it was not critical to know that the power was off as it relates to moisture damage, Endurance argues, because the inability to turn the power back on (and thus the heating and air conditioning) means that the loss still contributed to the moisture damage. [Filing No. 124 at 8.] Endurance also argues that Seneca's criticism of Mr. Haden's conclusions regarding the roof punctures, water damage, moisture levels, and whether the roof is sloped are "merely a difference of opinion" between experts, which does not support exclusion. [Filing No. 124 at 5-7.] Further, Endurance argues that the precise source of the stained ceiling

tiles is irrelevant because the reason for their removal is to rerun the electrical wiring, not because a few are stained.  [Filing No. 124 at 7.]  Endurance also argues that the number of break-ins does not matter because Mr. Haden's job "was to establish what it would cost to repair the damage done in the break-ins, not to establish a forensic account of exactly when they occurred."  [Filing No. 124 at 8.]  As to relevance and helpfulness, Endurance asserts that Seneca's arguments are without merit for several reasons: (1) an opinion as to whether damages were caused by theft or vandalism is a legal issue that Mr. Haden cannot opine on; (2) reliance on the electrical estimates from Holt and Rebuilt is proper because reliance on estimates from specialized contractors is standard practice in insurance adjusting; and (3) an opinion as to bad faith is impermissible because it is a legal standard.  [Filing No. 124 at 9-10.]

In reply, Seneca reiterates its arguments from its Motion and adds that since bad faith is a key issue in this matter and Mr. Haden is not offered by Endurance to opine on bad faith, his testimony and the Haden Report are not relevant or helpful.  [Filing No. 128 at 10.]  Seneca also argues that an opinion on bad faith is permissible.  [Filing No. 128 at 10.]

**C.  Discussion**

*1.  Whether Mr. Haden Is Qualified*

Rule 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education."  The Seventh Circuit has "recognized that while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trs. of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Savings Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 787-88 (7th Cir. 2007) (quotations and citation omitted).  Accordingly, the Court

8

considers "a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.* at 788 (quotations and citation omitted).

The Court finds that Mr. Haden is qualified to testify as a damage expert based on his extensive experience in the insurance adjusting industry and his certifications. He is a licensed adjuster, a certified appraiser and umpire, and had 22 years of experience in the insurance adjusting industry at the time of his involvement in this case. [Filing No. 121-3 at 1; *see also* Filing No. 99-7 at 2.] Throughout his career in insurance, he has held a multitude of roles requiring the evaluation of damage, including as an adjuster in a Special Investigative Unit, a catastrophe claims adjuster/property loss specialist, a public adjuster, an independent adjuster, and an appraiser/umpire. [Filing No. 121-3 at 1-3.] Seneca's argument that Mr. Haden has not taken specific classes relating to building materials, does not have hands-on electrical contracting experience, and has not worked in the construction field misses the point. When looking at his "full range of practical experience as well as academic or technical training," *Trs. of Chicago Painters,* 493 F.3d at 788, Mr. Haden is qualified to opine on the damages at issue in this case. And although not dispositive, Mr. Haden has been recognized as an expert in damage value in multiple states, including Texas, North Carolina, Florida, and even Indiana. [Filing No. 115-6 at 2-5; *see also* Filing No. 121-3 at 3.] Seneca's assertion that Mr. Haden "has never been recognized . . . in an expert capacity in an Indiana state or federal court" is false. [Filing No. 116 at 10.] In fact, Seneca's own counsel questioned Mr. Haden regarding "the case in Indiana where [Mr. Haden was] identified as an expert."[1] [Filing No. 115-6 at 3.]

_____

[1] As Seneca's counsel noted, the case in Indiana where Mr. Haden was identified as an expert is *RAP Indy, LLC v. Zurich American Insurance Co.*, No. 1:19-cv-04657, 2021 WL 2416740 (S.D. Ind. June 6, 2021).

Seneca also points to Rule 702's advisory committee note (2000 Amendments), which addresses witnesses "relying solely or primarily on experience," but Mr. Haden is not relying solely or primarily on experience—he also has training and education in the adjusting industry as detailed above.  Moreover, Seneca is unclear as to what it means by "not licensed to do business in the State of Indiana" and how that affects Mr. Haden's testimony.  [Filing No. 116 at 10.]  Seneca recognizes that Mr. Haden "is not being offered as a public adjuster in this litigation," [Filing No. 116 at 10], so to the extent that "not licensed to do business in the State of Indiana" refers to Mr. Haden not being licensed as a public adjuster in Indiana, it is extraneous.  Mr. Haden is not being offered as a public adjuster, so whether he is licensed in Indiana as such is irrelevant.  And to the extent that "not licensed to do business in the State of Indiana" refers to Haden Claims Services not being registered as a company in Indiana, Seneca fails to assert any legal argument as to how that would factor into Mr. Haden's qualification as a damages expert, and thus waives the argument.  *Blise v. Antaramian*, 409 F.3d 861, 866 n.3 (7th Cir. 2005) ("The failure to develop an argument constitutes a waiver.").  The Court finds that Mr. Haden is qualified to testify as an expert on the issue of damages.

### 2.  *Whether Mr. Haden's Methodology Is Sufficiently Reliable*

The Supreme Court in *Daubert* set forth four factors that a court may consider when determining whether an expert witness's methodology is reliable, including: (1) whether the methodology "can be (and has been) tested"; (2) whether the methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the methodology is generally accepted.  *Daubert*, 509 U.S. at 593-94.  However, these factors are not a "definitive checklist or test," *id.* at 593, and the weight of the factors is dependent on "the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd., v. Carmichael*, 526

U.S. 137, 150, (1999).  The key focus "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.  The Court focuses on the expert's methodology and leaves "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis . . . to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  In other words, the Court does "not assume the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul that would inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." *Stollings v. Ryobi Techs.*, Inc., 725 F. 3d 753, 766 (7th Cir. 2013) (quotation and citation omitted).

The Court finds Mr. Haden's methodology is sufficiently reliable.  Mr. Haden inspected the Property on four different days, reviewed a collection of documents relevant to this case, and implemented best practices derived from his years of experience in the insurance adjusting industry to draw conclusions therefrom.  [*See* Filing No. 99-7 at 2-4.]  Methodology deriving from experience and industry standard is an acceptable and reliable methodology in this case.  *See Kumho Tire*, 526 U.S. 137, 150 (1999) (stating that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience"); *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000) (finding that an expert's opinion was based on professionally sound and reliable underlying methodology because it "was based on his extensive investigative experience"); *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1097 (N.D. Ill. 2001) (finding that an expert's opinion on roof damage was reliable because the underlying methodology was based on specialized knowledge and extensive practical experience).

11

The fact that Mr. Haden did not know that thieves returned and did not know that the power was off at the time of the loss does not make his methodology unreliable such that his testimony and the Haden Report should be excluded.  First, Mr. Haden was hired to inspect and evaluate the extent of the damage done, not to curate a timeline of when the damage occurred.  Second, mistakes and misunderstandings are not grounds for excluding evidence.  *See, e.g.*, *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

Seneca's remaining arguments, that both of its experts show that Mr. Haden and the Haden Report are unreliable, are a misguided attempt at having the Court usurp the role of the jury.  These arguments, like whether the roof is not sloped (as Mr. Haden asserts) or is sloped (as Mr. Tognetti asserts), or whether ceiling tiles need to be removed to adequately evaluate the damage, attack Mr. Haden's conclusions rather than his methodology.  But the "correctness" of expert conclusions, "are factual matters to be determined by the trier of fact." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Ford Motor Co.*, 215 F.3d at 718).  Seneca's arguments regarding reliability relate to the weight of Mr. Haden's testimony, rather than to its admissibility.  Seneca is free to use cross examination and its own experts to attack Mr. Haden's conclusions.  But the Court finds Mr. Haden's methodology to be sufficiently reliable.

### 3.  *Whether Mr. Haden's Testimony Will Assist the Trier of Fact*

To assist the trier of fact, the expert's testimony "must fit the issue to which the expert is testifying and be tied to the facts of the case." *Owens v. Auxilium Pharm., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (quotation and citation omitted).  Further, an expert "must testify to something

more than what is obvious to the layperson." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (quotation and citation omitted).

The Court finds that Mr. Haden and the Haden Report will assist the trier of fact in evaluating the damage done to the Property by the break-ins and determining the scope of repairs. The average layperson does not have extensive and specialized knowledge in evaluating damage to a commercial building. Further, Seneca's contention regarding the impermissibly of Mr. Haden's reliance on the electrical damages estimates from Holt Construction and Rebuilt Construction fails. Rule 703 allows experts to rely on data and other information supplied by third parties as long as the information proves to be reasonably relied upon by experts in the particular field. Yet Seneca does not claim that reliance on specialized subcontractor estimates is not of the type reasonably relied upon by experts in Mr. Haden's field. Seneca only takes issue with Mr. Haden's estimate being based on other estimates, which Rule 703 expressly authorizes. Seneca's argument also ignores that Mr. Haden inspected and discussed the damages alongside both Holt Construction and Rebuilt Construction and reviewed both estimates for completeness and accuracy. [Filing No. 99-7 at 1-4.]

Lastly, Seneca's critiques of the scope of Mr. Haden's opinions are baseless. Parties are free to call experts for limited purposes, and more important, no expert can construe the Policy or draw legal conclusions therefrom. *Ebert v. Ill. Cas. Co.*, 188 N.E.3d 858, 863-84 (Ind. 2022) ("The interpretation of an insurance policy is primarily a question of law for the court."); *Good Shepard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). The Court finds that Mr. Haden's testimony will assist the trier of fact.

13

Because the Court finds that Mr. Haden is qualified to testify as an expert on the issue of damages, his methodology is sufficiently reliable, and his testimony will assist the trier of fact, Seneca's Motion to Exclude Report and Testimony of Plaintiff's Expert Witness Brian Haden, [Filing No. 115], is **DENIED**.  The Court will consider Mr. Haden's opinions below, applying the requisite standard of review.

## IV.
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A.  Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for

one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id*. at 648.

### B.  Statement of Facts

At the outset, the Court notes that both parties improperly argue their versions of the facts in their summary judgment briefs, even where those facts are disputed.  Such practice does not comply with Local Rule 56-1(b), which requires parties to identify "the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."  S.D. Ind. L.R. 56-1(b).  It also disregards the applicable standard for summary judgment requiring all inferences to be drawn in favor of the non-moving party.  Further, this practice is one step away from improper "shenanigans." *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014) (explaining that misrepresentations of the record do not comport with the parties' duty of candor to the courts).  This briefing strategy tested the Court's endurance and patience and resulted in an unduly cumbersome review of the 224 pages of briefs and 1,273 pages of exhibits to ensure an accurate construction of the facts for summary judgment.  The Court applies the proper summary judgment standard and sets forth the relevant facts below.

#### 1.   The Policy

The Policy is an all-risk policy, [Filing No. 99-10 at 6], with a $5,000 deductible, [Filing No. 99-22 at 6], and a Policy Period of December 1, 2018, to December 1, 2019, [Filing No. 99-9 at 2].  The policy was apparently renewed but then cancelled effective December 31, 2019, after a change in the Property's ownership.  [Filing No. 99-22 at 2; Filing No. 99-22 at 8-9; *see also* Filing No. 112-4 at 45.]

The Policy provides coverage only for loss or damage commencing during the Policy Period.  [Filing No. 99-22 at 3.]  Under the Policy, Seneca agreed to "pay for direct physical loss

of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." [Filing No. 99-9 at 4.]  In relevant part, "Covered Property" means "the building or structure described in the Declarations, including: (1) Completed additions; (2) Fixtures, including outdoor fixtures; [and] (3) Permanently installed: (a) Machinery; and (b) Equipment." [Filing No. 99-9 at 4.]  "Covered Cause of Loss" means "direct physical loss unless the loss is excluded or limited in this policy." [Filing No. 99-9 at 6.]

The Policy excludes the following causes of loss:

- "Wear and tear";

- "Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself";

- "Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more"; and

- "Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss."

[Filing No. 112-2 at 4].

The Policy has a separate Theft Exclusion, which provides:

We will not pay for loss or damage caused by or resulting from theft.

But we will pay for:
1. Loss or damage that occurs due to looting at the time and place of a riot or civil commotion; or
2. Building damage caused by the breaking in or exiting of burglars.

And if theft results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

[Filing No. 99-9 at 7.]  The Policy also includes a Vacancy Permit endorsement, which excludes Sprinkler Leakage, but not Vandalism, as a covered cause of loss.  [Filing No. 99-9 at 5.]

2. *The Policy's Assignment to Endurance*

The named insured on the Policy is Anoteros 3222, LLC ("Anoteros").  Anoteros assigned its rights and interests under the Policy to Gift Fund, LLC ("Gift Fund") on December 27, 2019. [Filing No. 99-15.]  Gift Fund, in turn, assigned its rights and interest under the Policy to Endurance in May 2020.  [Filing No. 99-16.]  Given that the assignments are not questioned, the Court collectively refers to the involved entities as Endurance for ease of reference unless the context requires otherwise.

3. *Initial Discovery of Theft and Damage*

Mary Sullivan, the Property Manager, visited the Property on November 7, 2019, and discovered that it had been broken into.  [Filing No. 99-2 at 2.]  Ms. Sullivan called the police, who dispatched an officer to the Property.  [Filing No. 99-2 at 2.]  The officer prepared a police report on the same day identifying the following damage:

- Removal of face panels from electrical boxes and larger heavy gauged wires cut and removed from large conduit in main panel room/garage area;

- Removal of face panel from exterior electric panel box and heavy gauge wires cut inside;

- Broken exterior PVC pipe with wire removed;

- Removal of top panel from roof electrical box and wires removed;

- Removal of ceiling tiles;

- Missing 60" wall-mounted flat screen TV; and

- Damage in the form of stress cracks to the front main glass doors from prying.

[Filing No. 99-2 at 2.]  The police report also noted that Ms. Sullivan believed a portable generator from the maintenance room cage was missing.  [Filing No. 99-2 at 2.]

18

Ms. Sullivan also reported the damage to Seneca on November 7, 2019, [Filing No. 99-1 at 14-15], and prepared an internal Incident Report that same day, [Filing No. 99-4; *see* Filing No. 99-1 at 17], identifying the damage as:

- Front door badly bent and glass cracked;

- Several electrical panel covers removed and copper wiring cut;

- Several ceiling tiles in kitchen, mail room, and first floor office area removed and accessed to pull wire;

- Exterior panels stripped;

- Accessed roof and stripped;

- TV and maybe generator missing; and

- Cut lock at the west gate.

[Filing No. 99-4 at 1.]

### 4. *Seneca Hires Engle Martin to Inspect the Damage and Discovers an Additional Break-in*

Seneca retained Engle Martin, an independent adjustment firm, on November 11, 2019, four days after Ms. Sullivan first discovered the theft and damage at the Property. [Filing No. 99-5 at 1; Filing No. 99-5 at 28; Filing No. 99-2 at 1-2.] Engle Martin's Senior Property Adjuster inspected the Property the following day with Ms. Sullivan. [Filing No. 99-5 at 6.] During the inspection, Ms. Sullivan discovered that additional wires were removed, and additional damage was done, which she reported to the police. [Filing No. 99-2 at 3.] Four days after that discovery, a police officer conducted a security check of the Property and found additional evidence of cut wires and a pair of red bolt cutters. [Filing No. 99-2 at 1; Filing No. 99-2 at 4.]

5. *Engle Martin Asks Seneca About Policy Coverage*

Engle Martin emailed Seneca's assigned claim examiner, Lakeisha Haskins, on November 14, 2019, to notify her that the loss inspection was completed.  [Filing No. 99-18 at 2-3.]  In the email, Engle Martin asked Seneca to advise on whether cut, but not yet stolen, wires "would be considered damages caused by vandalism, or would they be considered theft?"  [Filing No. 99-18 at 3.]  Engle Martin explained that:

> If the cables would be considered under the vandalism clause [sic], then it appears that there would be coverage.  If these are considered covered, we suggest retaining an electrical engineer to quantify the amount of damages to the building's [sic] electrical system.  If the damages outlined above are considered theft, then it appears that there is no coverage for this loss.

[Filing No. 99-18 at 3.]  Engle Martin followed up on November 19, 2019, asking whether Seneca had "a determination on whether the cut electrical cables constitutes vandalism and not theft" and whether Seneca "approve[d] of the electrical engineer assignment?"  [Filing No. 99-18 at 2.]

Ms. Haskins replied to the follow up email that same day but could not give Engle Martin an answer after reviewing the Policy herself, [Filing No. 99-10 at 27], so she responded that her manager was reviewing the file and would get back with further recommendations on the claim after his review.  [Filing No. 99-18 at 1.]  Later on November 19, 2019, her manager determined that the wires were cut and stolen, constituting theft, and recommended denial because of the Theft Exclusion.  [Filing No. 99-19 at 1-2.]  Ms. Haskins informed Engle Martin that her "manager ha[d] finished his reviewed and advised the wires were cut and stolen."  [Filing No. 99-18 at 1.]  She also classified the claim as a theft claim and stated, "[a]s theft is excluded, please provide an estimate for the damages caused by the breaking into and exiting."  [Filing No. 99-18 at 1.]

### 6. *Engle Martin Submits Its First Report Estimating the Damage*

After its inspection, Engle Martin submitted its first report to Seneca on November 20, 2019, with a net estimated loss of $345,000.  [Filing No. 99-5 at 1.]  Engle Martin noted in the report that there was an issue of coverage because of the Policy's Theft Exclusion and stated that the Replacement Cost Value of the covered damages was $3,578.45, which fell below the Policy's deductible.  [Filing No. 99-5 at 2; Filing No. 99-5 at 7.]

### 7. *Engle Martin Follows Up Regarding an Electrical Engineer Assignment*

It appears that Seneca did not answer Engle Martin's question from both the November 14 and 19, 2019 emails concerning the electrical engineer because Ms. Haskins followed up with her manager on November 20, 2019, asking whether Seneca "should proceed with retaining an electrical engineer to quantify the amount of damages to the building electrical system." [Filing No. 99-20 at 2.]  Ms. Haskins again followed up with her manager asking the same question on November 25, 2019.  [Filing No. 99-20 at 1.]  Her manager replied the same day, stating "Ok to assign electrical engineer. Let's hold off on denial until inspection results come in." [Filing No. 99-20 at 1.]

### 8. *Engle Martin Updates Its Estimate After Engaging an Electrical Engineer*

After engaging Envista Forensics for the purpose of confirming the extent of damage to the electrical system, [Filing No. 99-11 at 4], Engle Martin submitted another report to Seneca on January 17, 2020, with an updated net estimated loss of $1,495,000, [Filing No. 99-11 at 1].  The report noted that the electrical engineer for Envista Forensics found that the damage to the electrical system was "extensive" and "gave a rough estimate of $1.5-$2 million for the building damages." [Filing No. 99-11 at 5.]  Envista Forensics then engaged Titan Electric to determine the scope of electrical repairs.  [Filing No. 99-13 at 5.]

Envista Forensics and Titan Electric completed their inspections and assessments of the electrical damages at the Property during the week of February 24, 2020.  [Filing No. 112-7 at 5.] Engle Martin reported that, during its discussion with Envista Forensics and Titan Electric regarding their inspections, it appeared that the Property sustained further damages from those noted during the original inspection.  [Filing No. 112-7 at 5.]  Engle Martin also reported that Envista Forensics and Titan Electric would be itemizing the repair estimate.  [Filing No. 112-7 at 6.]

Titan Electric sent an itemized repair estimate to Engle Martin on April 13, 2020.  [Filing No. 112-9 at 1-2.]  The estimate was separated into three different "scopes" based on damage causation (damaged with intent to steal; damaged during theft; and stolen materials) and a fourth general construction costs scope.  [Filing No. 112-9 at 1-2.]  The total estimate for the electrical repairs across all four scopes was $492,544.  [Filing No. 112-9 at 1-2.]  Envista Forensics reviewed Titan Electric's estimate and reported that the estimate was "fair and reasonable" and "consistent with the fair market price for like kind and quality equipment."  [Filing No. 112-10 at 1-2.]

On April 22, 2020, Engle Martin submitted a report to Seneca summarizing Titan Electric's itemized repair estimate and noting that Envista Forensics reviewed the estimate.  [Filing No. 99-13 at 5-7.]  Engle Martin's total estimate of loss remained at $1,495,000.  [Filing No. 99-13 at 1.]

On April 29, 2020, Titan Electric submitted an updated itemized repair report to Engle Martin.  [Filing No. 112-11 at 1-2.]  The report was substantially the same in form and substance but for a lower cost estimate of $462,544, [Filing No. 112-11 at 2], which may have been due to a decrease in the cost of copper wiring, [Filing No. 112-12 at 15].

9. *Endurance Hires Brian Haden to Inspect the Property and Damage and Provide an Estimate*

Endurance hired Mr. Haden of Haden Claims Services to inspect the Property and determine the amount of loss.  [Filing No. 99-7 at 2.]  Endurance also hired Rebuilt Construction, and Holt Construction to provide full quotes for restoring the Property.  [Filing No. 99-7 at 3.]  Mr. Haden, representatives from Rebuilt Construction and Holt Construction, and electrical subcontractors inspected the Property on June 3 and 4, 2020, and again on October 1 and 2, 2020. [Filing No. 99-7 at 1.]

10. *Mr. Haden Estimates the Damage*

Based on Rebuilt Construction's estimate, which was more complete than Holt Construction's estimate according to Mr. Haden, Mr. Haden reported that it would cost $3,795,005 to repair the Property from damage caused by the break-ins.  [Filing No. 99-7 at 3-4; Filing No. 99-7 at 8.]  Mr. Haden stated that his "observations confirmed the findings indicated on the police report," but also that "there was further building [sic] damage as a result of water intrusion from the roof top."  [Filing No. 99-7 at 2.]  The Haden Report noted punctures in the roof near the roof top units that were broken into and had wires cut and removed.  [Filing No. 99-7 at 3.]  The Haden Report also explained that the removal of the electrical wiring caused the Property to be without power for an extended period of time, which allowed for elevated moisture in the building, damaging "drywall, wallpaper, ceiling tiles, floor coverings, remaining electrical components including elevators, remaining wiring, computers, and electrical components."  [Filing No. 99-7 at 3.]

11. *Mr. Haden Learns New Information that Would Lead Him to Amend His Report*

At the time of writing the Haden Report, Mr. Haden did not know that the power was off in the building on November 7, 2019.  [Filing No. 112-27 at 5-6.]  After submitting the Haden

Report, Mr. Haden learned that the power was off and stated that he "would change or amend" his report to state that there were "contributing factors prior to the date of the event that contributed to" elevated moisture levels. [Filing No. 112-27 at 12.] Mr. Haden also testified that, in light of the new information, he would remove certain line items from his estimate. [Filing No. 99-8 at 8.]

### 12. Seneca Requests Documentation

On April 7, 2020, Seneca sent a letter to Gift Fund requesting documents and information regarding the Policy's assignment from Anoteros to continue investigating "the facts and circumstances surrounding the purported Assignments" and its validity and impact on coverage. [Filing No. 112-8 at 1-2.] On April 28, 2020, Seneca sent another letter to Gift Fund asking for documentation on the date and time of the loss, the damages for which an insurance claim was being made, the amount of the claim, and documentation supporting any damage claimed. [Filing No. 112-13 at 2-3.] On May 5, 2020, Seneca sent a letter to Anoteros requesting the submission of a formal Sworn Statement in Proof of Loss ("Proof of Loss Statement") by July 6, 2020. [Filing No. 112-2 at 2.] On July 1, 2020, Seneca repeated its April 28, 2020 request for documentation regarding the loss, the damages for which an insurance claim was being made, the amount of the claim, and documentation supporting any damage claimed. [Filing No. 112-13 at 2-3.]

### 13. Anoteros' Proof of Loss Statements

Anoteros submitted a Proof of Loss Statement on June 3, 2020. [Filing No. 112-13 at 4.] On July 1, 2020, Seneca informed Anoteros that the Proof of Loss Statement was not satisfactory because several line items of information were left blank, including the "Time and Origin" of the loss, "The Whole Loss and Damage" line, and "The Amount Claimed" line. [Filing No. 112-13 at 4.] Anoteros submitted a completed Proof of Loss Statement on June 25, 2021, claiming a loss amount of $3,790,004 after accounting for the $5,000 deductible. [Filing No. 99-17 at 1.]

*14. Seneca Interprets the Policy and Denies Coverage*

Seneca interpreted the Policy and determined coverage based on inspecting the Property, reviewing the Policy, working with counsel regarding the theft exclusion, and working with adjusters and management.  [Filing No. 99-21 at 20; Filing No. 99-21 at 49-52.]  In its denial letter sent July 6, 2021, Seneca stated as follows:

> [L]oss or damage caused by or resulting from theft is expressly excluded by the Theft Exclusion Endorsement to Seneca's policy.  While the Theft Exclusion Endorsement does provide limited coverage for building damage caused by the breaking in or exiting of burglars, we have determined that the building damage caused by the breaking in or exiting of burglars amounts to $4,772.29 at actual cash value, which is less than the $5,000 policy deductible. . . .  Accordingly, we regret to inform you that we are unable to reimburse you for the damage from breaking in or exiting because the amount of loss is less than the $5,000 policy deductible applicable to each theft loss.
>
> You have also informed us that you are not making a claim to us for any damage to the roof, drywall, wallpaper, flooring, fire suppression systems, security systems or any purported resulting moisture or water damage or any loss or damage that occurred prior to November 2019 or after your December 27, 2019 donation of the property and you are not making claim for any loss or damage after the December 31, 2019 policy cancellation.  Rather, you have confirmed that your claim is limited to damage from breaking in and entering as well as loss or damage caused by or resulting from the November 2019 theft losses.  Notwithstanding, no coverage exists under your policy for loss or damage not commencing during the policy period and no coverage exists for any loss or damage after you cancelled the policy on December 31, 2019.
>
> Although you have confirmed that Endurance's Report of Findings does not constitute your claim and you are not making claim for the conditions noted in that report, there is no coverage for the conditions contained therein in any event.  For example, as discussed above, the considerable loss and damage caused by or resulting from theft contained in the Report of Findings is excluded by the Theft Exclusion Endorsement quoted above.  Accordingly, no coverage exists for the loss or damage contained in the Report of Findings caused by or resulting from the November thefts.
>
> Endurance's "Report of Findings" also contains reference to alleged roof, drywall, wallpaper, flooring damage unrelated to the November 2019 thefts.  The Report of Findings states that "there was further building damage as a result of water intrusion from the roof top."  In particular, the "Report of Findings" notes that water purportedly entered the building from certain roof punctures as well as an opening

on the roof in electrical conduit and damaged drywall, wallpaper, ceiling tiles, floor coverings and the like." Brian Tognetti from WJE inspected the property and reviewed these purported conditions and determined that there is no correlation between the claimed roof punctures and water-related interior finish damage and the theft event.  None of the water related interior finish conditions presented in the Report of Findings was caused by water entering the building through the roof openings identified in the Report of Findings or the roof-top conduit stubs.  Rather, as discussed in Mr. Tognetti's report, any interior water or moisture conditions were due to long-term leakage, long term cyclic exposure to changes in interior temperatures and humidity over the past several years due to the pre-theft vacant and unconditioned status of the building and/or deteriorated conditions associated with the EPDM roofing system including poorly installed or deteriorated penetrations and termination flashings, blistered and open seam tape and unadhered roof patches.

These conditions do not constitute "direct physical loss of or damage" caused by or resulting from a covered cause of loss within the terms and conditions of the policy and the loss and damage contained in the Report of Findings is not fortuitous. Moreover, Seneca's policy only affords coverage for "loss or damage commencing during the policy period shown in the Declarations."

[Filing No. 99-22 at 8-9.]

### 15. This Lawsuit

Endurance initiated this lawsuit in Marion County Superior Court on November 1, 2021, and on December 9, 2021, Seneca removed the case to this Court.  [Filing No. 1.]  The operative Amended Complaint seeks declaratory judgment "establishing Seneca's obligation to pay for the loss at the Property" and asserts claims for breach of contract and breach of the duty of good faith and fair dealing, entitling Endurance to compensatory damages, punitive damages, and prejudgment interest.  [Filing No. 27.]

Endurance filed its Motion for Partial Summary Judgment on March 23, 2023, in which it asks the Court to make the declarations it requests in its Amended Complaint but does not seek summary judgment as to damages for bad faith.  [Filing No. 99.]  Seneca filed a Cross-Motion for Summary Judgment on July 7, 2023, in which it seeks summary judgment on all of Endurance's claims, arguing that it does not owe coverage for any of the losses claimed by Endurance and that

it did not act in bad faith. [Filing No. 112.]  The Court now considers the Cross-Motions for

Summary Judgment.

### C. Discussion

#### *1. Breach of Contract Claim*

In support of its Motion for Partial Summary Judgment, Endurance presents several

arguments ranging from its entitlement to full coverage under the Policy to coverage for everything

but the wiring.  First, Endurance argues that it is entitled to full coverage because the Theft

Exclusion is ambiguous as "it purports to exclude coverage for theft, but also negates that

exclusion." [Filing No. 100 at 11.] Specifically, Endurance argues that "results in" is the negating

provision and makes the Theft Exclusion ambiguous because it is circular—"[i]t excludes coverage

for loss caused by theft, but if theft causes a covered cause of loss, the loss is covered." [Filing

No. 100 at 12.]  Endurance asserts that Seneca's own claims handler, Ms. Haskins, gave three

different interpretations of the exclusion, which is evidence of its ambiguity. [Filing No. 100 at

12-13.]  Endurance cites to an Oregon case interpreting a similar provision and describing it as

"circular, incomprehensible, or ambiguous," [Filing No. 100 at 17 (citing *Stack Metallurgical

Servs., Inc. v. Travelers Indem. Co. of Conn.*, 2007 WL 464715 at *7 (D. Ore. Feb. 7, 2007)*], and

two other cases interpreting more restrictive exclusions that were found ambiguous, [Filing No.

100 at 20-24 (citing *Haas v. Audubon Indem. Co.*, 722 So. 2d 1022 (La. App. 1998) and *Detroit

City Diary, Inc. v. United Nat'l Ins. Co.*, No. 2:07-cv-11228 (E.D. Mich. Aug. 7, 2007) (Dkt. 17))].

Endurance also argues that it is entitled to full coverage because the Theft Exclusion does not

apply since "theft," which is not defined in the Policy, means the taking of personal property

according to Black's Law Dictionary and no personal property was taken—only the wiring was

taken, which is a fixture. [Filing No. 100 at 24-27.]  Second, and in the alternative, Endurance

argues that if it is not entitled to full coverage, then the "only loss that could possibly be excluded by the Theft Exclusion is the scrap value of the copper that was taken" because "[a]ll the other damage was caused by vandalism, or intentional destruction of property." [Filing No. 100 at 19.]

In response and in its Cross-Motion for Summary Judgment, Seneca argues that the Theft Exclusion bars all coverage because it is unambiguous. [Filing No. 113 at 27-37.] Seneca asserts that since theft is not defined in the Policy, the generally accepted common law definition applies, which defines the term as the unlawful taking of all property, including fixtures. [Filing No. 113 at 33-35.] Seneca contends that the damage to the Property was caused by theft, and not vandalism, because the "property was actually taken/stolen." [Filing No. 113 at 20.] Seneca also asserts that the "results in" clause of the Theft Exclusion does not restore coverage because it is not ambiguous when read with the rest of the exclusion. [Filing No. 113 at 27-32.] In support, Seneca cites two cases analyzing the same theft exclusion and concluding that it is not ambiguous—*SSL, Inc. v. Scottsdale Insurance Co.*, No. 4:16-00324, 2017 WL 6389676 (W.D. Mo. Aug. 4, 2017) and *Chalmers Management, Inc. v. Western Heritage Insurance Co.*, No. 13-11802, 2015 WL 1005371 (E.D. Mich. Mar. 5, 2015). Seneca also argues that Endurance's claim regarding water-related damage is excluded from coverage by the Causes of Loss and Weather Exclusions because such damage was not caused by the November 2019 theft events. [Filing No. 113 at 37.] Seneca argues that its experts conclude that the Property was already suffering water-related damages prior to the theft incidents. [Filing No. 113 at 38-39.]

Endurance argues in its reply in support of its Motion for Partial Summary Judgment and its response to Seneca's Cross-Motion that the cases that Seneca cites in support of its argument that the Theft Exclusion is unambiguous do not apply the law of Indiana and are therefore inapplicable. [Filing No. 123 at 7-12.] Endurance also argues that the cases conflict with some of

28

Seneca's own interpretations of the exclusion, [Filing No. 123 at 12-13], and that the remaining cases that Seneca cites interpret "named peril" policies, not "all risk" policies like the Policy at issue here, [Filing No. 123 at 14-15].  Endurance further contends that Seneca did not show that its interpretation of the Theft Exclusion is the only reasonable one as it must under Indiana law. [Filing No. 123 at 16-19.]  Endurance argues that the parties' arguments over the definition of "theft" show "its meaning is manifestly ambiguous" and therefore the coverage-saving definition should prevail.  [Filing No. 123 at 22.]  As to Seneca's argument that the Causes of Loss and Weather Exclusions provisions bar coverage, Endurance responds that Seneca has not met its burden of proving the applicability of the exclusion, and that Mr. Haden identified punctures in the roof caused by the trespassers in November 2019 that allowed water to enter the building. [Filing No. 123 at 24-28.]

In its reply, Seneca reiterates that the Theft Exclusion bars coverage for the claim and that ambiguity does not exist merely because the parties proffer differing interpretations of the Policy or different definitions of "theft."  [Filing No. 129 at 3.]  Seneca also reiterates that two courts have found the exact same theft exclusion to be unambiguous, [Filing No. 129 at 10], and that the Policy excludes the water-related damages for the same reasons as in their cross-motion, [Filing No. 129 at 12-15.]

When the Court exercises diversity jurisdiction over an action, it is "obliged to apply state law to the substantive issues in the case." *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, (1938)).  The parties do not dispute that Indiana law governs this action.  Accordingly, this Court must "apply the law that would be applied by the Indiana Supreme Court." *Lodholtz*, 778 F.3d at 639.  "If the Indiana Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the state's

intermediate appellate courts as authoritative, unless there is a compelling reason to think that the state supreme court would decide the issue differently." *Id.*

The Indiana Supreme Court has summarized the well-established standards for interpreting insurance policies in Indiana as follows:

> The interpretation of an insurance policy is primarily a question of law for the court, and therefore well-suited for summary judgment. . . .
>
> In Indiana, insurance contracts are subject to the same rules of interpretation as other contracts. Ordinarily, we construe ambiguous policy provisions in favor of the insured, especially if the provisions limiting coverage are not clearly and plainly expressed. In doing so, we further the policy's basic purpose of indemnity and recognize the disparate positions between the insurer and insured.
>
> On the other hand, we give clear and unambiguous language in a policy its plain and ordinary meaning. A policy is unambiguous if reasonable persons cannot honestly differ as to its meaning. Reasonable persons might differ if the language is susceptible to more than one interpretation. However, a policy is not ambiguous simply because the parties assert contrary interpretations.

*Ebert*, 188 N.E.3d at 863-84 (citations and quotations omitted). The Indiana Supreme Court has also instructed that:

> [A] term is not ambiguous by the mere fact that the parties differ as to its meaning. Nor is a term necessarily ambiguous if a particular policy does not define the term. Indeed, we have cautioned that parties to an insurance contract may not invite judicial construction by creating ambiguity. They may not make a term ambiguous by simply offering different policy interpretations.
>
> We proceed then with the understanding that insurance policy provisions are ambiguous only if they are susceptible to more than one reasonable interpretation. Whether two or more reasonable interpretations for a term exist is viewed from the perspective of . . . ordinary policyholder[s] of average intelligence. If reasonably intelligent policyholders would honestly disagree on the policy language's meaning, the term is ambiguous and subject to judicial construction. Conversely, if reasonably intelligent policyholders could not legitimately disagree as to what the policy language means, we deem the term unambiguous and apply its plain ordinary meaning.

*G&G Oil Co. of Ind., Inc. v. Cont. W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021) (citations and quotations omitted).

The Court will "construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs." *West Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 598 F.3d 918, 921 (7th Cir. 2010) (quotation and citation omitted) (applying Indiana law). Further, the Court "may construe only ambiguous policy terms and provisions." *Erie Indemnity Co. for Subscribers at Erie Ins. Exch. v. Est. of Harris by Harris*, 99 N.E.3d 625, 630 (Ind. 2018). Words are given their ordinary meaning, though where ambiguity exists the policy is read "strictly against the insurer." *Id.* Ambiguous language in the policy is resolved in favor of the insured as long as such an interpretation harmonizes the provisions of the contract as a whole. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 578 (Ind. 2013).

The Court interprets the Policy in accordance with the above standard.

a. The Theft Exclusion

The Court first addresses the parties' dispute over the definition of "theft" before turning to the Theft Exclusion.

The parties present two differing interpretations for "theft" and argue as to ambiguity. When viewed from the perspective of an ordinary policyholder of average intelligence as Indiana law instructs, common sense rejects Endurance's definition of "theft." Endurance's reliance on the definition of "personal property" in Black's Law Dictionary's definition of "theft" imports a hyper-technical legal connotation to the term that is not derived from its plain and ordinary meaning, nor is a connotation that an ordinary policyholder with average intelligence would import. Words are given their plain and ordinary meaning, and "theft" has only one reasonable interpretation—the unlawful taking of any movable property. First, immediately following the initial definition of "theft" in Black's Law Dictionary, which reads "[t]he wrongful taking and removing of another's

31

personal property with the intent of depriving the true owner of it," the second sentence reads, "[b]roadly, any act or instance of stealing, including larceny, burglary, embezzlement, and false pretenses." Black's Law Dictionary, Theft (11th ed. 2019).  When read together, an average policyholder would understand the term to cover any act of stealing.  But even assuming that an average policyholder would look up the definition of "personal property" after reading the definition of "theft," such a search would reveal that "personal property" is defined as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property." Black's Law Dictionary, Personal Property (11th ed. 2019) (defined under "property").  Black's goes on to define "real property" as "either corporeal (soil and buildings) or incorporeal (easements)." Black's Law Dictionary, Real Property (11th ed. 2019) (defined under "property"). This linear exploration of terms does not produce the convoluted and hyper-technical legal meaning of "personal property" that Endurance argues for.  Rather, Endurance's complicated construction of "theft" ignores its plain and ordinary meaning and is an improper "invit[ation] [to] judicial construction by creating ambiguity." G&G Oil Co. of Ind., 165 N.E.3d at 87.  Theft, in its plain and ordinary meaning as explored above, is not ambiguous; it means the unlawful taking of any movable property excluding real property such as soil, buildings, and easements.  This is the definition the Court applies to the Policy.

The Court now turns to whether the Theft Exclusion is ambiguous.  As set forth above, the Theft Exclusion provides:

> With respect to the location(s) indicated in the Schedule, the following is added to the **Exclusions** section:
>
> We will not pay for loss or damage *caused by or resulting from* theft.
>
> But we will pay for:
> 1. Loss or damage that occurs due to looting at the time and place of a riot or civil commotion; or

2. Building damage caused by the breaking in or exiting of burglars.

And if *theft results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.*

[Filing No. 99-9 at 7 (emphasis added).]

Reading the Theft Exclusion from the viewpoint of an ordinary policyholder (which in this case, is an ordinary commercial policy holder) of average intelligence as Indiana law demands, there is no question that the Theft Exclusion is ambiguous. The Theft Exclusion starts out by clearly excluding "loss or damage caused by or resulting from theft." The provision remains clear in the middle sentence, stating that the Policy does not exclude loss or damage from looting and building damage caused by the breaking and exiting of burglars. But all clarity wholly dissolves when reading the last sentence. The last sentence, specifically the "results in" language, purports to restore coverage that would otherwise be excluded by the language in the first clause, specifically the "caused by or resulting from" language. Notably, the Policy does not discern the difference between damages "resulting from theft"—which are excluded—and "if theft results in" damages from a Covered Cause of Loss—which the Policy covers. This language is circular and does not lead to one reasonable interpretation.

The ambiguity is underscored by the questions raised by Seneca's adjuster, Engle Martin, as well as Ms. Haskins' inability to clearly articulate its meaning and scope. In her deposition, Ms. Haskin first testified that she did not see a difference between the "resulting from theft" and "if theft results in" language. [Filing No. 99-10 at 13-15.] Ms. Haskins later testified that she was "confused" by the earlier questioning, and described the difference as:

So here it says: We will not pay for loss or damage caused by or resulting from theft. So that's period, there's not coverage for theft there. But then over here, it says: If theft results in a covered cause of loss, again, as I just said, if it results in water damage or – what's another one? – we have water damage, vandalism, is one

of them.  We will pay for that loss or damage caused by that covered cause of loss. So that means we'll pay for the covered portion under the covered causes of loss, but again, theft is not covered so we're not paying for anything that has to do with the theft.

[Filing No. 99-10 at 39-40.]  And later when asked by Seneca's counsel, Ms. Haskins testified as follows:

> A: Okay. It says: And if theft results in a covered cause of loss, we will pay for the loss or damage caused by that covered cause of loss. So that means that theft is out, of course, we just said theft is out, but if that theft resulted in a covered cause of loss, we would pay for those damaged resulting from that covered cause of loss, not the theft.
>
> Q: So the theft is not covered?
>
> A: Correct.
>
> Q: But anything resulting secondarily from the theft is covered. Is that what I understand that to be?
>
> A: Correct.

[Filing No. 99-10 at 63-64.]  Although Ms. Haskins may have been confused in answering the question regarding the difference in the first and last clauses of the Theft Exclusion when first asked, her second and third answers still evidence some ambiguity regarding the scope of what besides the actual theft is restored by the last clause.  "[A]nything that has to do with theft" is not the same as "resulting secondarily from the theft."

Moreover, Ms. Haskins is not an ordinary policyholder of average intelligence—she is an industry professional who has been a property claims examiner (a role where she reviews insurance policies and determines whether certain losses are covered) since 2000.  [Filing No. 121-5 at 6-9.] The Court is not convinced that, from the viewpoint of the average policyholder of ordinary intelligence, there is but one reasonable interpretation of the Theft Exclusion.  Rather, the Theft

Exclusion is susceptible to more than one reasonable interpretation, namely, the scope of coverage restored by the last sentence.

Seneca cites *SSL, Inc.*, 2017 WL 6389676 and *Chalmers Management, Inc.*, 2015 WL 1005371, to show that other courts have found the same provision to be unambiguous. But these cases do not help the Court because they do not apply Indiana's law on the construction of insurance policies. This Court is tasked with "apply[ing] the law that would be applied by the Indiana Supreme Court," *Lodholtz*, 778 F.3d at 639, but Seneca's cases apply the law of Missouri and Michigan, respectively. *SSL, Inc.*, 2017 WL 6389676 (applying Missouri law); *Chalmers Mgmt., Inc.*, 2015 WL 1005371 (applying Michigan law).[2] Based on Indiana's standard, the Theft Exclusion is ambiguous and subject to judicial construction. *See G&G Oil Co. of Ind., Inc.*, 165 N.E.3d at 87 ("insurance policy provisions are ambiguous only if they are susceptible to more than one reasonable interpretation" and "[i]f reasonably intelligent policyholders would honestly disagree on the policy language's meaning, the term is ambiguous and subject to judicial construction").

The Court now turns to construing the ambiguous provision. In so doing, the Court must resolve the language in favor of the insured as long as such an interpretation harmonizes the provisions of the contract as a whole. *Holiday Hosp. Franchising, Inc.*, 983 N.E.2d at 578.

Harmonizing the contract as a whole, the Court finds that any item actually stolen, such as the wire, TV, and portable generator, is excluded as a loss directly resulting from "theft," as the word is defined above. The Court will not rewrite the Policy to include theft, but in construing the

---

[2] Despite its criticism of Seneca's reliance on out of state case law, the Court notes that Endurance also relies on cases applying law from other states in support of its position. [*See* Filing No. 100 at 17; Filing No. 100 at 20-24.] Because these cases also do not apply Indiana law and because two of the cases do not involve identical policy provisions, Endurance's cases are likewise unhelpful to the Court.

"results in" clause in the light most favorable to coverage, the Court finds that if the theft otherwise results in a Covered Cause of Loss, damages from the Covered Cause of Loss are covered by the Policy.  In other words, stolen items are not covered because theft is excluded, but otherwise covered losses and resulting property damage that occurred because of the theft are.  Such an interpretation is reasonable because it excludes the value of stolen items as consistent with the Policy excluding "theft," and then harmonizes the third sentence and its contradictory "results in" language by restoring coverage for otherwise covered losses such as intentional destruction of property, negligent destruction of property, or vandalism.  Indeed, this is one of the interpretations that Ms. Haskins herself offered, and notably, the one she offered while being questioned by Seneca's counsel during her deposition.

The Court **GRANTS** in part Endurance's Motion for Partial Summary Judgment, [Filing No. 99], to the extent it finds that the Theft Exclusion is ambiguous and construes the Theft Exclusion to bar coverage for all stolen items but to provide coverage for other covered losses resulting from the theft and "loss or damage caused by that Covered Cause of Loss."  The Court also **DENIES** Seneca's Motion for Summary Judgment, [Filing No. 112], to the extent it seeks a finding that the Theft Exclusion precludes any coverage under the Policy except the minimal amount it determined was within Endurance's deductible.

But the foregoing construction is only half of the battle.  In order for Seneca to be required to pay for damages beyond the stolen property under the Court's construction set forth above, Endurance is still required to prove that its claimed damages were caused by an otherwise covered cause of loss.

b.  Damages

In addition to contesting the construction of the policy, the parties present competing experts who differ considerably on the causation and extent of damages to the Property.  In the Haden Report, Mr. Haden evaluates the total damage at $3,795,004.  [Filing No. 99-7 at 8.]  But after learning that the power was not on at the Property when the break-ins occurred, Mr. Haden testified that several items in the estimate should no longer be included.  [Filing No. 99-8 at 7-8.] Based on this testimony, Endurance argues that the new estimate is $2,570,067.  [Filing No. 100 at 28.]  Notably, however, an updated report by Mr. Haden was not submitted to the Court, making the Court's determination of how exactly Mr. Haden would amend his Report and how his estimate matches with the Court's coverage determination impossible.  Further, the original estimate "proposes to repair, *replace*, and return the office building to pre-loss condition" and states that "[a]ll permits, labor, *material*, *equipment* and supervision [are] included to complete the project unless otherwise noted."  [Filing No. 99-7 at 7 (emphasis added).]  This language could be read to include the replacement of stolen items, which the Court has found are not covered under the Policy.  Accordingly, the Court cannot determine as a matter of law at this stage of the proceeding whether all items claimed resulted from a Covered Cause of Loss.  Further, Seneca and its experts dispute the total cost of electrical repairs.  [Filing No. 112-9; Filing No. 112-10; Filing No. 113 at 14-15.]

Lastly, the parties also dispute whether the water-related damage was caused by the theft. [Filing No. 99-22 at 8.]  Endurance and Mr. Haden argue that the roof punctures from the November 2019 break-ins resulted in water-related damage, [Filing No. 99-7 at 3; Filing No. 123 at 24], while Seneca and its experts argue that "there is no correlation" because the water-related damages had occurred prior to November 2019 due to the property being unconditioned and

without power and not receiving proper maintenance.  [Filing No. 99-22 at 8; *see also* Filing No. 112-3 at 50-53; Filing No. 115-7 at 21-22; Filing No. 115-7 at 43.]  As noted earlier, the Policy's coverage period ended in December 2019, and it will be Endurance's burden to prove—in addition to causation from a Covered Cause of Loss—the extent to which water-related damage occurred before the end of the Policy period.  In any event, fact issues remain as to the cause and the severity of the claimed damages, which precludes summary judgment.  The Court **DENIES** Endurance's Motion for Partial Summary Judgment, [Filing No. 99], to the extent that it finds that the causation of and amount of damages is an issue for the trier of fact.  To the extent Seneca sought summary judgment on the extent of damages covered, the Court also **DENIES** Seneca's Motion for Summary Judgment, [Filing No. 112].

### c.  Prejudgment Interest

Endurance argues that it is entitled to prejudgment interest on its damages.  [Filing No. 100 at 28-29.]  Under Indiana law, "[a]n award of prejudgment interest is proper when the trier of fact does not have to exercise judgment in order to assess the amount of damages." *Larson v. Karagan* 979 N.E.2d 655, 663 (Ind. Ct. App. 2012) (citation omitted).  As explained above, the trier of fact will have to exercise judgment in order to assess the amount of damages.  Accordingly, the Court finds that Endurance is not entitled to prejudgment interest.  The Court **DENIES** Endurance's Motion for Partial Summary Judgment, [Filing No. 99], and finds that it is not entitled to pre-judgment interest.

### 2.  Bad Faith Claim

In support of its Motion for Partial Summary Judgment, Endurance argues that Seneca breached its duty to deal in good faith when it delayed making a coverage determination and denied coverage with the knowledge that its policy language is ambiguous.  [Filing No. 100 at 29-35.]  In

support, Endurance cites *Monroe Guardian Insurance Co. v. Magwerks Corp.*, 829 N.E.2d 968 (Ind. 2005), for the proposition that a good faith dispute concerning insurance coverage does not automatically preclude bad faith. [Filing No. 100 at 33-34.]

Seneca argues in its response to Endurance's Motion for Partial Summary Judgment and in support of its Cross-Motion for Summary Judgment that it conducted a timely, diligent, and thorough claim investigation and that its denial of coverage was the result of a good faith dispute over the meaning of the Theft Exclusion. [Filing No. 113 at 45-54.] Seneca argues that Endurance is attempting to paint the claim and its investigation as a straightforward one, but it is not. [Filing No. 113 at 48.] Seneca asserts that it was required to beg for months for information from the different parties involved and conduct multiple inspections at the Property because of the evolving nature of the claim. [Filing No. 113 at 48.]

Endurance argues in its response to Seneca's Cross-Motion for Summary Judgment and its reply in support of its Motion for Partial Summary Judgment that "Seneca misunderstands Indiana law, under which ambiguous policy language must be interpreted in favor of coverage if a reasonable coverage-saving interpretation is possible." [Filing No. 123 at 28 (citation omitted).] It argues that evidence of ambiguity is found in Seneca's own personnel interpreting the Theft Exclusion in different ways, [Filing No. 123 at 28-32], and that Seneca does not address *Monroe Guardian Insurance Co.* because it is fatal to its position, [Filing No. 123 at 32]. Lastly, Endurance contends that even if the Court disagrees with Endurance, it has brought forth enough evidence to preclude summary judgment in favor of Seneca on the issue. [Filing No. 123 at 33.]

Seneca reiterates that it had a rational and principled basis for its denial and, as such, Endurance's bad faith claim fails. [Filing No. 129 at 15-18.] It also argues that Endurance's reliance on *Monroe Guardian Insurance Co.* is misguided because Endurance's allegations of bad

faith rest solely on a dispute about coverage, which is not enough for a showing of bad faith under *Monroe Guardian Insurance Co.* in any event.  [Filing No. 129 at 19-20.]

Indiana law recognizes a cause of action for an insurer's breach of its duty to deal with its insured in good faith.  *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993).  This duty of good faith includes, but is not limited to, "refrain[ing] from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of [its] claim."  *Id.*; *see also Monroe Guar. Ins. Co.*, 829 N.E.2d at 976 ("[A]n insurer's duty to deal in good faith with its insured encompasses more than a bad faith coverage claim").  The duty is not necessarily breached merely because an insurer denies a claim, even if it is later determined that the insurer breached the contract.  *Erie Ins. Co.*, 622 N.E.2d at 520.  The duty is also not necessarily breached by a lack of diligent investigation.  *Id.*  Rather, the duty is breached when the insurer "denies liability knowing that there is no rational, principled basis for doing so."  *Id.*

A finding of bad faith "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will."  *Monroe Guar. Ins. Co.*, 829 N.E.2d at 977 (quotations and citation omitted).  Intent is a factual issue that can be proved by circumstantial evidence.  *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 41 (Ind. Ct. App. 1999) ("[A] final determination of the significance of all of the evidence presented by [the insured] is a question for the jury").

As a preliminary matter, although it is possible for an insurer to erroneously deny or limit a claim without breaching its duty of good faith, the inverse is not true.  In other words, in order for Endurance to prevail on a claim that Seneca breached its duty of good faith and fair dealing by issuing a claim decision that it knew was irrational or unfounded, Endurance needs to establish

both that Seneca's denial of the claim was a breach of the Policy, and that Seneca had the requisite knowledge and intent to act in bad faith. *See Erie Ins. Co.*, 622 N.E.2d at 520; *Monroe Guar. Ins. Co.*, 829 N.E.2d at 977. Endurance has made the first showing, and the Court has determined that Endurance is entitled to summary judgment in its favor and against Seneca with respect to its construction of the policy. Seneca's denial breached the Court's construction of the policy.

As to the second showing, Endurance has presented evidence that could lead a reasonable jury to conclude that Seneca acted in bad faith during the handling of Endurance's claim, including but not limited to evidence that:

- Seneca knew its policy was ambiguous as evidenced by its own personnel and outside adjuster having difficulty interpretating the Theft Exclusion, [Filing No. 99-10 at 39-40; Filing No. 99-10 at 63-64];

- Seneca's coverage determination was not made until July 6, 2021, but the loss occurred on November 7, 2019, [Filing No. 99-22]; and

- The denial letter failed to acknowledge the "results in" clause in the Theft Exclusion, [Filing No. 99-22].

Some of this evidence, however, is disputed by Seneca. For example, Seneca has presented evidence that its coverage determination was only delayed because it had to ask multiple times for relevant documents, including a completed Proof of Loss Statement, from Anoteros, Gift Fund, and Endurance. [Filing No. 112-2 at 2-3; Filing No. 112-13 at 2-3.] Accordingly, neither party has presented evidence that as a matter of law entitles it to judgment on this issue. Rather, the evidence presented is enough to create a genuine issue of material fact and to withstand summary judgment on the issue. The Court **DENIES** both Endurance's Motion for Partial Summary Judgment, [Filing No. 99], and Seneca's Motion for Summary Judgment, [Filing No. 112], as to Endurance's bad faith claim.

## V.
### CONCLUSION

For the foregoing reasons, the Court:

- **DENIES** Seneca's Motion for Oral Argument, [130];

- **DENIES** Endurance's Motion to Strike, [123];

- **DENIES** Seneca's Motion to Exclude, [115];

- **GRANTS** in part Endurance's Motion for Partial Summary Judgment, [99], to the extent that it finds that the Policy does not provide coverage for the value of any stolen items, but does provides coverage for any loss or damage caused by a covered cause of loss resulting from the theft;

- **DENIES** Endurance's Motion for Partial Summary Judgment, [99], as to the amount of damages, the entitlement to prejudgment interest, and the bad faith claim; and

- **DENIES** Seneca's Motion for Summary Judgment, [112], in its entirety.

No partial final judgment shall issue.  The Court requests that the Magistrate Judge confer with the parties as soon as practicable to address the possibility of resolving the outstanding issues prior to trial.


Date: 10/31/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record.**